**AFFIDAVIT OF SPECIAL AGENT WILLIAM HUGHES IN SUPPORT OF
APPLICATIONS FOR SEARCH AND SEIZURE WARRANTS**

I, WILIAM HUGHES, state:

**INTRODUCTION AND AGENT BACKGROUND**

1.      For the last seven years, I have been a Special Agent with the United States Food
and Drug Administration, Office of Criminal Investigations (FDA-OCI).  I am currently assigned
to the Boston Resident Office.  I am responsible for investigating violations of the Federal Food,
Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.,* and other federal statutes enforced by
the FDA, and am empowered to conduct investigations, make arrests, and execute search and
arrest warrants for these offenses.  Before that, I was a Special Agent with the Criminal
Investigation Command, United States Army for over eleven years, and before that I was a
Military Police Officer, United States Army for over nine years.

2.      In my law enforcement career, I have continually received training in criminal
investigative techniques, and have completed numerous courses including the FDA-OCI Special
Agent Training Program at the Federal Law Enforcement Training Center and the United States
Army Criminal Investigations Special Agent Training Course.  I graduated from Campbell
University in North Carolina with a degree in Criminal Justice.

3.      I make this affidavit in support of applications for warrants to search ████████
████ Belmont, MA ("████████████") and 54 Cummings Park, Suite 320, Woburn, MA ("54
Cummings Park") (together, the "SUBJECT PREMISES") as described in the Attachment A
associated with each of the SUBJECT PREMISES.

4.      The requested search warrants seek authorization to seize evidence, fruits, or
instrumentalities of the introduction of misbranded and unapproved new drugs into interstate
commerce, in violation of 21 U.S.C. §§ 331(a) and (d); the receipt of misbranded drugs in

interstate commerce and the delivery or proffered delivery of the misbranded drugs, in violation

of 21 U.S.C. § 331(c); smuggling, in violation of 18 U.S.C. § 545; and conspiring to commit

these offenses, in violation of 18 U.S.C. § 371, as described more fully in the Attachment B

associated with each of the SUBJECT PREMISES.[1]

     5.     I also make this affidavit in support of an application for a warrant to seize the

following property (the "TARGET FUNDS"):

     a.     Up to $154,037 on deposit in account ████0866 (the "TD 0866 TARGET ACCOUNT") held in the name of Ycells LLC at TD Bank;

     b.     All funds on deposit in Merrill Lynch Brokerage Account ███9W33 (the "Merrill 79W33 TARGET ACCOUNT") held in the name of Yalan TANG;

     c.     Up to $36,000 held in E*Trade account ███3508 (the "E*Trade 3508 TARGET ACCOUNT") held in the name of Yalan TANG;

     d.     Up to $80,000 held in JP Morgan Chase brokerage account ███8263 (the "JPM 8263 TARGET ACCOUNT") held in the name of Yalan TANG; and

     e.     All funds held in TD Ameritrade account ████5481 ("the TD Ameritrade 5481 TARGET ACCOUNT" held in the name of Chenguang GONG, less $178.00.

     6.     Based on the facts set forth below, there is probable cause to believe that the

TARGET FUNDS are property that constitutes or is traceable to proceeds of specified unlawful

activity, namely conspiracy to commit smuggling, in violation of 18 U.S.C. §§ 371 and 545 and,

as such, are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C.

§§ 981(a)(1)(C), 982(a)(2)(B) and 28 U.S.C. § 2461(c).

     7.     The facts set forth in this affidavit are based upon my personal observations and

review of records, my training and experience, and information obtained from other agents and

---

[1] On November 5, 2020, a grand jury returned an indictment charging Yalan TANG and Chenguan GONG with one count of conspiracy, in violation of 18 U.S.C. § 371, and twenty-one counts of introducing misbranded drugs into interstate commerce with intent to defraud and mislead in violation of 21 U.S.C. §§ 331(a) and 333(a)(2). Pursuant to Fed. R. Crim. P. 32.2, the Indictment also contained a forfeiture notice provision.

witnesses.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## RELEVANT LAW

8.      Congress enacted the FDCA to protect the public from, among other things, drugs that are misbranded, unapproved, or otherwise unsafe.  The FDA enforces the FDCA, and its responsibilities include regulating the manufacturing, labeling and distribution of drugs shipped or received in interstate commerce.

9.      Under the FDCA, drugs are defined in relevant part as (1) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of diseases in man, and (2) articles (other than food) intended to affect the structure or function of the human body.  21 U.S.C. § 321(g)(1)(B) and (C).

10.     Under the FDCA, a "new" drug is generally defined as one that is not generally recognized among qualified experts as safe and effective for use under the conditions prescribed, recommended, or suggested in its labeling.  21 U.S.C. § 321(p).

11.     It is a prohibited criminal act under the FDCA to introduce or deliver for introduction, or cause the introduction or delivery for introduction, into interstate commerce, any new drug that is not approved by the FDA for distribution in the United States. 21 U.S.C. §§ 331(d), 333(a) and 355(a).

12.     A drug is misbranded if it does not have labeling bearing adequate directions for use.  21 U.S.C. § 352(f)(1).  "Adequate directions for use" is defined by regulation as directions adequate for a layperson to use the drug safely and for the purpose for which it was intended.  21 C.F.R. § 201.5.  Among other things, directions for use may be inadequate because of the omission of statements of all the uses for which the drug is intended, quantity of dose, frequency of administration, and route or method of administration.

13.     A drug is also misbranded if its labeling is false or misleading in any particular way.  21 U.S.C. § 352(a).

14.     A drug is also misbranded if it was manufactured, prepared, compounded, or processed in an establishment not duly registered under 21 U.S.C. § 360.  21 U.S.C. § 352(o).

15.     It is a prohibited criminal act under the FDCA to introduce into interstate commerce a misbranded drug, or to receive in interstate commerce a misbranded drug and then deliver, or proffer delivery of, the misbranded drug to others.  21 U.S.C. §§ 331(a), 331(c), and 333(a).

16.     It is unlawful to fraudulently or knowingly import merchandise into the United States contrary to law or to knowingly receive, conceal, buy, or sell merchandise that has been imported contrary to law.  18 U.S.C. § 545.

17.     Any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 545, or a conspiracy to commit such an offense, is subject to forfeiture to the United States.  18 U.S.C. § 981(a)(1)(C).

18.     The Court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate, 18 U.S.C. § 545, shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.  18 U.S.C. § 981(a)(2)(B).

19.     This Court has authority to issue the requested seizure warrant pursuant to 18 U.S.C. § 981(b)(3), which provides "a [civil] seizure warrant may be issued . . . by a judicial officer in any district in which a forfeiture action against the property may be filed under [28 U.S.C. § 1355], and may be executed in any district in which the property is found."  Here, pursuant to 28 U.S.C. § 1355(b)(1)(A), this Court has jurisdiction over forfeiture proceedings

because the acts or omissions giving rise to the forfeiture occurred in the District of Massachusetts.

20.    This Court also has authority to issue the requested warrant pursuant to 21 U.S.C. § 853(f), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), which provides that the "Government may request the issuance of a [criminal] warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant.  If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that [a protective] order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property."  Here, a protective order is insufficient because I know that restraining orders served on banks sometimes fail to preserve the property for forfeiture because, despite the best intentions of a financial institution, restrained funds are occasionally released, transferred or otherwise dissipated. In contrast, a seizure warrant guarantees that the funds will be transferred to, and held securely in, the Government's custody once the warrant is served.

**PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED AND THAT THE SUBJECT PREMISES CONTAIN EVIDENCE, FRUITS, AND INSTRUMENTALITIES**

*First Customs and Border Protection Seizure and Initiation of the Ycells Investigation*

21.    On October 27, 2016, U.S. Customs and Border Protection (CBP) seized a FedEx package in New Orleans, LA, containing suspected Sildenafil Citrate.  Sildenafil Citrate is the active ingredient in the FDA approved drug Viagra® and is used to treat erectile dysfunction.

22.    The package was addressed to Emily Decoung, 15 Main Street, Suite 292, Watertown, MA 02472.  I determined that this address was a UPS Store and that Suite 292 was

rented to Yalan TANG who listed her address on the UPS rental application as 54 Cummings
Park, Suite 320, Woburn, MA.

23.     The website of the Massachusetts Secretary of the Commonwealth, Corporations
Divisions listed TANG as the "Resident Agent" for Ycells LLC when it was organized as a
limited liability company under Massachusetts law on September 22, 2014.  The address for
Ycells was originally identified as 51 Regent Road, Malden, MA 02148.  The Certificate of
Organization for Ycells LLC was later updated replacing TANG as the Resident Agent and
changing the company address to 54 Cummings Park, Suite 320, Woburn, MA 01801.

24.     Through an open source internet search for Ycells LLC, I discovered the website
Ycells.com.  Although the content of the website is limited, it offered for sale customized
peptides, amino acids and chemical derivatives.  The website listed 54 Cummings Park, Suite
320, Woburn, MA as the physical address for the company.  The website listed the email address
info@ycells.com[2] and the phone numbers (855) 833-2949 and (617) 513-5528 as means to
contact the company.

25.     The Department of Homeland Security provided to me a list of shipments
imported to the United States and addressed to Ycells LLC, SLLECY (Ycells backwards) or to
UPS mailboxes rented by TANG or GONG.  Since December 2015, more than 500 packages
have been shipped to these addresses.  Of those, at least 450 shipments were labeled "Peptides
for Research Use Only."  Only a single one of these packages was sent to the Ycells business
address at 54 Cummings Park, Suite 320, Woburn, MA. The other packages were sent to ▮▮▮
▮▮▮▮▮▮▮▮, Belmont, MA (a single-family home), 464 Common Street, Suite 317, Belmont,

---

[2] On March 25, 2019, a search warrant was issued for contents and information relating to the email account
info@ycells.com.  19-MJ-6147-MPK.

MA (a UPS Store), and other residential addresses and UPS stores. ████████

Belmont, MA is the residential address listed on Yalan Tang's driver's license.

***Additional CBP Seizures***

26.     On January 23, 2018, CBP seized a package arriving through JFK International

Airport, from China.  The package was addressed to "Heidi Syngenes," ██████████,

Belmont, MA.  The package manifest identified the contents as "Hairdressing Cosmetics";

however, upon examination by CBP, the package contained a white powdery substance later

identified by the FDA's Forensic Chemistry Center ("FCC") as Methasterone, a Schedule III

steroid commonly used for body building purposes.

27.     On February 14, 2018, CBP seized a package arriving through the SFO Airmail

Center, from China, destined for "Joe S. Ycells" at 1337 Massachusetts Avenue, Suite 272,

Arlington, MA.  1337 Massachusetts Avenue, Arlington, MA is the location of a UPS Store.

Suite 272 has been rented to Yalan TANG, who listed her address as ██████████,

Belmont, MA, since January 28, 2017.  The label of the package identified the contents as

"Yarn" and identified the sender's address as Shandong, China.  Upon examination by CBP, the

package weighed 1,010 grams and the contents were later identified by the FCC as

Methoxydienone, a steroid commonly used for body building purposes.

28.     On December 31, 2019, CBP seized a package weighing approximately 10.5kg,

shipped from China, addressed to "Sllecy" (Ycells spelled backwards), 15 Main Street, Suite

292, Watertown, MA 02472.  15 Main Street, Watertown, MA is the location of a UPS store.

Suite 292 was rented to TANG.  The package manifest identified the contents as "Peptide

(acyclic)" and the sender's address as Wuxi, China.  Upon examination, the package contained

five hundred vials containing an unknown white powder labeled "G024-5"; five hundred vials

containing an unknown white in color powder labeled "G036-2"; and one thousand vials of an

unknown white powder labeled "G036-2." FCC analysis identified confirmed the substances as peptides and provided evidence of the presence of growth hormones.

***Email Correspondence with Ycells LLC***

29.     On January 31, 2018, utilizing an undercover email account, I sent an email to the address info@ycells.com, requesting a list of products and prices. Later that day, I received an email from info@ycells.com. The email stated, *"Thank you for the inquiry. Yes, we provide all kinds of amino acids and derivatives. In the attachment please see the full list. Let me know if you have any question. Best, Wendy."* Attached to the email was an Excel spread-sheet listing 1,884 different products, quantities and prices. The products were all listed as chemical formulas; there were no common names associated with the formulas.

30.     On July 16, 2018, I sent an email addressed to "Wendy" at info@ycells.com requesting a price list with common names of products. I received an email response requesting examples of the products I was looking for. On July 23, 2018, I sent an email to info@ycells.com including a list of drugs. The list included Tadalafil, Ostarine, Andarine, Winstrol, and Methyltest, which are all drugs commonly used for body building or to counteract the effects of steroid use. I received an email response from info@ycells.com stating: *"I see what you are looking for. We should be able to provide some of them for research purposes. They are always in stock."*

***The California Investigation and Undercover Purchases of Illicit Steroids and Drugs***

31.     On July 16, 2018, I became aware of an OCI investigation in California concerning the purchase of steroids and drug products from Ycells.com and the resale of those products to human end users, mostly bodybuilders. The case agent for that investigation informed me that the subjects were willing to assist in an investigation into Ycells.com.

32.     With assistance from the cooperating subjects of the California investigation, OCI created a fictitious company and website that purported to sell steroids.  Again with assistance from the cooperating subjects of the California investigation, we made contact with Ycells.com via an undercover email address associated with our fake website.

33.     On August 30, 2018, we sent an email utilizing an undercover address to info@ycells.com requesting a product pricelist.  Later that same day, an email was received from info@ycells.com that stated, "*Thank you for reaching us, we do carry chemicals and peptides for research purpose, we guarantee the highest quality.*"  Included in the email was a price list for peptides, steroids and drugs including Anastrozole, Clenbuterol, MK-677, Sildenafil and Tamoxifen, which are all drugs commonly used for body building or to counteract the effects of steroid use.

34.     On August 31, 2018, we responded to info@ycells.com requesting additional information regarding the products that they offered, asking in particular whether the company was based in the United States, what forms of payments were acceptable, and whether their chemicals were finished products.

35.     That same day, we received a response stating that Ycells was U.S-based and located in Boston, MA, that Ycells accepted credit card and wire transfers, and that peptides were ready to ship upon payment, while liquids were prepared upon order and could be shipped within two days following payment.

36.     Attached to the August 31, 2018 email was a purchase agreement form that we were asked to sign and return. The purchase agreement asked for verification that the products sold by Ycells would be used for research purposes only.

37.     We signed and returned this purchase agreement via email to info@ycells.com.

38.     From my training and experience, and discussions with other FDA agents familiar with this topic, I am aware that distributors of illegal drugs routinely attempt to avoid regulatory scrutiny by disguising their products as "research chemicals." This is because FDA regulations exempt chemicals used in prescription drugs from the requirement that their labeling contain adequate directions for use, provided that the products are shipped or sold to persons engaged in research and are to be used only for this purpose. 21 C.F.R. § 201.125.

39.     On September 12, 2018, we sent an email order from our undercover account for the purchase of steroids and other drugs to Ycells LLC's email address at info@ycells.com. The purchase order consisted of twenty 30ml vials of Clenbuterol, ten 30ml vials of GW501516, ten 30ml vials of MK-2866/Ostarine, twenty 30ml vials of Raloxifene, twenty 30ml vials of Tamoxifen, twenty 30ml vials of Tadalafil, and twenty 30ml vials of Sildenafil. All of these drugs are commonly used for bodybuilding or to counteract the effects of steroid use. The purchase utilized an undercover credit card for payment, and the total cost of the purchase was $845.00 for the product and $20.00 for shipping. The product was to be shipped to an undercover P.O. Box in Winchester, VA.

40.     Later that day, September 12, 2018, a response was received from info@ycells.com confirming the order and providing a written quote.

41.     On September 18, 2018, FDA Special Agent Eric Flagg received a package shipped by Ycells LLC to the undercover P.O. Box in Winchester, VA. SA Flagg shipped the package unopened to me and I collected the contents as evidence. The box contained six smaller boxes, each of which was labeled "For Research Use Only" and "Not for Human Consumption." Each box contained 30ml blue vials topped with an eye dropper cap. The vials had the following labels: Raloxifene; Tamoxifen; Sildenafil; Tadalafil; Clenbuterol; GW501516; and MK-

2866/Ostarine.  The package did not contain labeling with directions for use for any of the drugs.

Testing conducted by the FCC determined that the vials contained the drugs identified on the

labels.

42.     On April 12, 2019, samples of the contents of the undercover purchase were

transferred to the USPIS to be evaluated for latent prints. On December 2, 2019, the Forensic

Laboratory Services, United States Postal Service provided their report indicating latent prints

belonging to Chenguang GONG were found on portions of the plastic sealing on the blue vials

labeled "Sildenafil," on the adhesive side of the white label marked "MK-2866," and on the

adhesive side of the "Ycells" tape removed from the exterior of the shipping box.

***Second Undercover Purchase of Illicit Drugs***

43.     On October 17, 2018, we received an email at our undercover account from

"Wendy" at the info@ycells.com email address.  The email stated, *"Haven't heard you since the*

*last order about a month ago. Just want to check in with you to see how you feel about our*

*product. Let me know if you have any question."*

44.     On October 22, 2018, we sent another email order from our undercover account

for the purchase of steroids and other drugs to Ycells LLC's email address at info@ycells.com.

This order requested Anastrozole, Tamoxifen, Letrozole, Clenbuterol, T3, YK 11, Ostarine, MK-

677, LGD 4033 and GAC Injection, all of which are drugs commonly used for body building or

to counteract the effects of steroid use.  The purchase was paid for using an undercover credit

card.  The total cost of the purchase was $4,500.00 for product and $60.00 for shipping.  The

product was again to be shipped to an undercover P.O. Box in Winchester, VA.  Again a

confirmation email was received from "Wendy" from the email address info@ycells.com on

October 23, 2018.

45.     On October 30, 2018, Special Agent Flagg received three boxes shipped from Ycells LLC to the undercover P.O. Box in Winchester, VA.  Special Agent Flagg shipped the packages unopened to me, and I collected the contents as evidence on November 1, 2018.  There were three boxes addressed from Ycells LLC, 54 Cummings Park, Suite 320, Woburn, MA 01801.  Each box contained smaller boxes, each of which was labeled "For Research Use Only" and "Not for Human Consumption."  The boxes contained twenty-five vials labelled GAC Glutamine 25mg/ml, twenty-five vials labelled Arginine 100mg/ml, twenty-five vials labelled Carnitine 250mg/ml, fifty vials labelled Clenbuterol 30ml, fifty vials labelled Anastrozole 30ml, twenty-five vials labelled MK-677 30ml, twenty-five vials labelled LGD-4033 30ml, twenty-five vials labelled MK-2866 30ml, fifty vials labelled YK-11 30ml, fifty vials labelled T3/Triiodothyronine 30ml, fifty vials labelled Tamoxifen 30ml, and fifty vials labelled Letrozole 30ml.  The package did not contain labeling with directions for use for any of the drugs.

46.     I determined that this package had been shipped from a UPS store located in Watertown, MA on October 26, 2018.

***Evidence Showing That Ycells is Aware That Its Products Are Sold for Human Consumption***

47.     On November 20, 2018, I sent an email to info@ycells.com stating: *"Hello Wendy, We have received numerous complaints from our customers in the past few weeks about symptoms of nausea, vomiting, dizziness, and even diarrhea with the recent purchase of SARMS and other research liquids.  They are also complaining of the strong alcoholic/chemical taste that burns when taking the liquids."*  The email further inquired whether the products had been made in a sterile environment and in the U.S. as advertised.

48.     On November 21, 2018, we received an email from "Wendy" utilizing the info@ycells.com address that stated, *"I am so sorry to hear that you got complaints about our*

*products.  Actually it is really rare for us to get complaints on chemical liquids. Especially for side effects, we never got this kind of feedback. Furthermore, your items were prepared with other orders from other customers at the same time, but we don't hear any bad report yet if there is anything wrong.  For alcoholic/chemical taste, we have to use alcohol to solve most of them, I believe that's the standard procedure, we really cannot make better on that. The only thing I can assure you is that we prepare our product in a sterile environment and always prepared fresh in the USA. The quality of chemicals and our handling processes are rigorous. I agree with you that the quality, the reputation is key to business, we never compromise on that."*

49.     I searched FDA resources and found no applications for new drugs have been submitted by Ycells LLC, nor is Ycells LLC registered through the FDA.  Furthermore, based on my training and experience, products intended for research and development are generally packaged in bulk and not divided into small quantities.

### Third Undercover Purchase of Illicit Drugs

50.     On October 7, 2019, I sent an email to the email address info@ycells.com requesting a quote to purchase GAC Injection, Clenbuterol, Tamoxifen, Ostarine, Anastrozole, Tadalafil and Sildenafil, all of which are drugs commonly used for body building or to counteract the negative effects of steroid use.  None of these drugs are approved by the FDA for these intended uses.  In addition, I inquired as to the availability and prices for the drugs Tianeptine and Phenibut.  Tianeptine and Phenibut belong to a class of drugs referred to as nootropics, which are commonly used to enhance mood or cognitive function.

51.     Later the same day, October 7, 2019, I received an email response from info@ycells.com.  That email stated: "*Hi Eric, Nice to hear from you! In the attachment please see the quote, let me know if you have any question. We can get them ready in two days if you are OK to proceed. Currently we don't have those two items you asked. I will talk with my*

*partner and let you know in couple days."*  The attached written quote for the purchase of GAC

Injection, Clenbuterol, Tamoxifen, Ostarine, Anastrozole, Tadalafil and Sildenafil totaled

$2,185.00, including $40.00 for shipping.

52.     I responded to the email that day stating that I would wait to place the order until

"Wendy" could determine the availability of the Tianeptine and Phenibut.

53.     On October 8, 2019, I received an email from the info@ycells.com email address

stating that *"We should be able to get Tia and Phen in about 2-4 weeks. For Tia, it's $6,000/kg*

*and $750/100g. For Phen it's $350kg. Let me know if you are interested."*  From my training and

experience I understand that "Tia" is shorthand for Tianeptine and "Phen" is shorthand for

Phenibut.

54.     On October 15, 2019, I sent an email to info@ycells.com via our undercover

email address asking if the order could be processed for delivery no later than the upcoming

Friday (October 18, 2019).  Later this same day, I received an email from info@ycells.com *"For*

*the order, we can make it deliveried (sic) this Friday. Is your credit card x5396 still valid? We*

*will charge it once the shipment is out."*  I responded to info@ycells.com from our undercover

email address that the credit card was valid and requested the order be processed.  In that same

email, I wrote *"We having been getting a lot of requests for tia, and I expect it will only go up.*

*Could you do a little better on the price?  If we can work something out we would start with a kg*

*in 10gram packs."*

55.     On October 16, 2019 at around 5:15 pm, I, along with other agents, conducted

surveillance at the ███████████ .  Shortly after 6 pm, GONG was observed arriving at that

address driving a black Honda CRV.  The Honda CRV was registered to him and bore license

plate number 9JBM40.  GONG parked in the driveway at that property and entered the

residence.  Shortly thereafter, a government agent observed GONG place several packages into

the rear of the Honda CRV.  GONG then departed the ███████████ and drove directly to a

UPS Store located at 15 Main Street, Watertown, MA.

56.     Upon his arrival at the UPS Store, I observed GONG remove three packages from

the rear of the Honda CRV and bring them into the UPS Store, completing the task in two trips.

Following GONG's departure, I made contact with the UPS Store manager who pointed to the

packages GONG had dropped off.  I identified and photographed each of the three packages.

Two of the packages were addressed to the undercover identity and address used when placing

the order for GAC Injection, Clenbuterol, Tamoxifen, Ostarine, Anastrozole, Tadalafil and

Sildenafil.  The two packages addressed to the undercover address (as well as the third package

dropped off by GONG) had a return address of Ycells LLC, 54 Cummings Park, Suite 320,

Woburn, MA 01801.

57.     On October 19, 2019, Special Agent Flagg received two packages shipped by

Ycells LLC to the undercover address in Winchester, VA. Special Agent Flagg shipped the

packages to me unopened and I inventoried and collected the contents as evidence.  The two

boxes contained a total of ten smaller boxes, each of which were labeled "For Research Use

Only" and "Not for Human Consumption."  The vials had the following labels: Clenbuterol,

Tamoxifen, MK-2866, GAC, Anastrozole, Tadalafil and Sildenafil.  Testing conducted by the

FCC determined the vials contained the drugs identified on the labels with the exception of the

sample labeled "GAC."  Based upon my training and experience, as well as discussions with

other agents, I understand that GAC stands for Glutamine, Arginine, and Carnitine which are

amino acids used by bodybuilders.  The FCC testing of the vials labeled GAC identified no

active pharmaceutical ingredients.

*Fourth Undercover Purchase of Illicit Drugs*

58.     Contemporaneously with placing the order for Clenbuterol, Tamoxifen, MK-2866, GAC, Anastrozole, Tadalafil and Sildenafil, I continued to negotiate via email for the purchase of Tianeptine from Ycells.

59.     On October 16, 2019, I received an email from info@ycells.com in response to the email sent from the undercover address the previous day.  The email from info@ycells.com stated, *"So you want a whole kg packed separately in 100x 10gram packs? I will ask to see if it is possible in manufacture end, also a shipment with 100 packs inside is not a good sign at Customs."*

60.     I responded the following day, October 17, 2019, from the undercover email account.  My email stated *"I see the shipment was sent [referring to the shipment of Clenbuterol, Tamoxifen, MK-2866, GAC, Anastrozole, Tadalafil and Sildenafil], thank you Wendy.  10gram packs would be best, what would you recommend to help with the customs issue?"*

61.     On October 18, 2019, I received an email from the email address info@ycells.com.  The email stated, *"I talked with manufacture but they don't want to generate 100x 10gram packs at 1kg price. It takes quite effort and wear&tear to do that. Sorry about that.*"

62.     After further negotiation of the price for Tianeptine, I reached an agreement with Ycells to purchase Tianeptine for a price of $5,000 for the first kilogram and $4,000 for subsequent kilogram orders with the Tianeptine to be packaged in twenty 50 gram packages.

63.     On December 12, 2019, I transferred $5,000.00 from an undercover bank account to an account held in the name of Ycells LLC at TD Bank.  That same day, I sent an email from the undercover email address to info@ycells.com indicating that the bank transfer had been completed.

64.     Later that day, I received an email from info@ycells.com.  That email stated, *"Hi Eric, Thank you for the payment, it has been posted. We will send package to you tomorrow for Tuesday delivery. Best, Wendy[.]"*

65.     On December 19, 2019, Special Agent Flagg received one package from Ycells LLC at the undercover Winchester, VA address. Special Agent Flagg shipped the package unopened to this agent.  On December 20, 2019, I received the package, inventoried it and processed it into evidence. There was one box addressed from Ycells LLC, 54 Cummings Park, Suite 320, Woburn, MA 01801.  The box contained twenty (20) pink in color, ziplock style bags, each containing approximately 50grams of white powder suspected to be Tianeptine. One of the bags was labeled "Tianeptine, 20 x 50 gram, For Research Use Only, Not for Human Consumption."  UPS tracking information indicated this package was shipped from the UPS Store located at 15 Main Street, Watertown, MA 02472.  Testing conducted by the FCC identified the white powder as Tianeptine.

66.     Tianeptine is not an FDA-approved drug.  Tianeptine is approved in 25 countries in parts of Europe and Asia as a tricyclic antidepressant.  Tricyclic antidepressants are among the earliest antidepressants developed but have been replaced by antidepressants that cause fewer side effects and are generally used as a last resort if other drugs fail.  Tianeptine is also known to have opioid receptor activity. Its overuse is associated with the effects of prescription painkillers and opioids, including its propensity to induce withdrawal symptoms.  Tianeptine withdrawal is characterized by high level of anxiety and excitability akin to withdrawal from opioids.  Online research for Tianeptine indicates that there are many sellers of Tianeptine to consumers in the United States.  Tianeptine is marketed as a cognitive enhancement product, commonly referred to as a "Nootropic."

*Additional Indications That Evidence, Fruits and Instrumentalities of a Federal Crime may be Found at the Subject Premises*

67.     On April 11, 2019 at approximately 6:38 pm, an FDA Special Agent observed GONG exit ▇▇▇▇▇▇▇ with multiple packages.  GONG entered the black Honda CRV bearing license plate number 9JBM40 that was parked in the driveway and departed.  Two FDA Special Agents followed the vehicle to the location of a UPS store located at 15 Main Street, Watertown, MA.  Upon arriving, GONG exited the vehicle and brought multiple packages into the UPS store.

68.     An FDA Special Agent followed GONG into the UPS store and witnessed GONG place three packages on the service desk and exit the store.  The Special Agent observed that the packages displayed UPS labeling.  One of the packages was placed on a scale and bore a UPS label.  Packing tape on the box displayed the name "YCELLS."  The UPS shipping label displayed the shipper as YCELLS LLC, 54 Cummings Park, Suite 329, Woburn, MA.  Two additional packages were placed next to the scale.  The packages were stacked on top of each other and were in UPS labeled packaging.  The top package had a UPS shipping label that displayed the shipper as YCELLS LLC, 54 Cummings Park.

69.     On April 22, 2019, at approximately 6:28 pm, I, along with another special agent, observed GONG depart from ▇▇▇▇▇▇▇ in the black Honda CRV bearing license plate number 9JBM40.  We followed GONG to a UPS store located at 15 Main Street, Watertown, MA.  I observed GONG exit the Honda CRV with a package, carry it into the UPS store and place it on the counter.  After GONG left the UPS store, I entered the UPS store and photographed the package.  The package had a UPS shipping label that displayed the shipper as YCELLS LLC, 54 Cummings Park, Suite 329, Woburn, MA.

70.     On April 23, 2019 at approximately 6:08 pm, a U.S. Postal Inspector observed

GONG exit ██████████ with several packages.  GONG placed the packages into the rear of

the Honda CRV bearing license plate number 9JBM40 that was parked in the driveway.  GONG

and TANG then both entered the Honda CRV and departed from ████████.  Along with

this Postal Inspector, I followed GONG and TANG to the UPS store located at 15 Main Street,

Watertown, MA.  The Postal Inspector observed GONG remove the packages from the vehicle

and place them on the counter in the UPS Store.  Upon GONG's departure from the store, the

Postal Inspector entered the store and photographed the packages. The packages all had UPS

shipping labels that displayed the shipper as YCELLS LLC, 54 Cummings Park, Suite 329,

Woburn, MA.

71.     On August 3, 2020, I received information from a Homeland Security

Investigations ("HSI") Special Agent concerning the seizure of two packages addressed to

Ycells.  One of the packages, seized by HSI on July 30, 2020 was addressed to Ycells at 464

Common Street, Suite 317, Belmont, MA 02478.  464 Common Street, Belmont, MA 02478 is

the location of a UPS store.  The second package seized by HSI on July 31, 2020 was addressed

to Ycells at 519 Somerville Ave, Suite 118, Somerville, MA 02143.  519 Somerville Ave, Suite

118, Somerville, MA 02143 is the location of a UPS store.

72.     The two packages contained a total of 3,200 vials with several different colored

caps, containing an unknown white powder.  Samples of the vials have been sent to the FCC for

analysis.

73.     On August 6, 2020, I received information from the same HSI Special Agent

concerning the seizure of another package addressed to Ycells at 738 Main Street, Suite 227,

Waltham, MA 02451.  This package contained a total of 1,300 vials with several different

colored caps, containing an unknown white powder.  Samples of the vials have been sent to the FCC for analysis.

74.     On August 12, 2020 at approximately 3:30 pm, I observed GONG exit the residence at ▮▮▮▮▮▮▮, Belmont, MA.  GONG was carrying a package which he placed in the back of the black Honda CRV, MA bearing license plate number 9JBM40 that was parked in the driveway.  GONG then entered the vehicle and drove to the UPS store located at 464 Common Street, Belmont, MA 02478.  Gong removed the package from the back of his vehicle, brought it into the UPS store and then departed.

75.     After GONG left the store, I entered the store and spoke with the manager.  The manager pointed to the package and gave consent for me to inspect it. The package was a medium sized box sealed with packing tape with "Ycells" printed on the tape.

76.     In addition to the information above, I have also reviewed emails to and from the email address info@ycells.com showing that equipment and supplies that can be used in the manufacture and packaging of drugs were ordered and shipped to ▮▮▮▮▮▮▮.  More specifically:

    a.  An email was sent from the email address liquidbottles941@gmail.com to info@ycells.com on June 13, 2018.  That email confirmed the order of "1080x 30ml Matte White Boston Round Bottle[s]" from Liquid Bottles LLC.  The payment address for the order was listed as "Chenguang Gong, YCELLS, 54 Cummings Park, Suite 320, Woburn Massachusetts 01801" and the shipping address was listed as "Wendy Z, ▮▮▮▮▮▮, Belmont, Massachusetts 02478."

    b.  An email was sent from the email address liquidbottles941@gmail.com to info@ycells.com on June 20, 2018.  That email confirmed the order of "1800x

30ml Cobalt Blue Boston Round Bottle[s]" from Liquid Bottles LLC.  The

payment address for the order was listed as "Chenguang Gong, YCELLS, 54

Cummings Park, Suite 320, Woburn Massachusetts 01801" and the shipping

address was listed as "Wendy Z, ████████ Belmont, Massachusetts 02478."

c.  An email was sent from the email address sales@bulkapothecary.com to

info@ycells.com on June 22, 2018.  That email confirmed the order of four 50 lb.

containers of glycerine and two 8 lb. containers of propylene glycol.  The

payment address for the order was listed as "Wendy Z, YCells LLC, 54

Cummings Park, Suite 320, Woburn Massachusetts 01801" and the shipping

address was listed as "Wendy Z, ████████, Belmont, Massachusetts 02478."

Through my training, experience, and coordination with subject matter experts, I

understand that glycerine and propylene glycol are commonly used in the

preparation of steroids, steroid-like products, and other drugs as a solvent.

d.  An email was sent from the email address customer.service@uline.com to

info@ycells.com on October 3, 2018.  That email confirmed the order of twenty

five "16 X 10 X 12" CORRUGATED BOXES" and five hundred "7 X 7 X 4"

CORRUGATED BOXES."  The "Sold To" address for the order was listed as

"YCELLS LLC, 54 Cummings Park, Suite 320, Woburn Massachusetts 01801"

and the shipping address was listed as "YCELLS LLC ████████, Belmont,

Massachusetts 02478."

e.  An email was sent from the email address sales@industrialcontainer.com on

September 26, 2018.  That email confirmed the order of two-thousand products

identified as "20-400 Black/Black Rubber 72 mm Plastic Graduated Printed -

M005A."  Based upon my review of products listed on the website
www.industrialcontainer.com, I understand that these are eye-dropper style caps
for vials or bottles.  The billing address for the order was listed as "Chenguang
Gong, 54 Cummings Park, Suite 320, Woburn Massachusetts 01801" and the
shipping address was listed as "Heidi T,            Belmont, Massachusetts
02478."

## PROBABLE CAUSE TO BELIEVE FUNDS IN THE TARGET ACCOUNTS ARE SUBJECT TO SEIZURE AND FORFEITURE TO THE UNITED STATES

### *Seizure of up to $154,037 in the TD 0866 TARGET ACCOUNT*

77.      TANG opened the TD 0866 TARGET ACCOUNT in the name of Ycells LLC on
or around January 22, 2015.  I have probable cause to believe that GONG and TANG engaged in
a conspiracy to smuggle and to introduce misbranded drugs into interstate commerce in violation
of 18 U.S.C. §§ 371 and 545, and 21 U.S.C. §§ 331(a) and (d), and that up to $2,538,920 of the
funds credited into the TD 0866 TARGET ACCOUNT during the review period, from October
1, 2015 to May 28, 2020, are proceeds of this conspiracy.

### Payments From the Undercover Purchases

78.      The first three undercover purchases described above, taking place on or about
September 15, 2018, October 26, 2018, and October 16, 2019, were paid for using an undercover
credit card account.  I have reviewed credit card statements for that undercover account,
statements obtained from Ycells' credit card processor, and bank statements for the TD 0866
TARGET ACCOUNT.  These records show that the funds debited from the undercover credit

card for the first two undercover purchases, dated September 15, 2018 and October 26, 2018, were credited to the TD 0866 TARGET ACCOUNT.[3]

79.     To execute the purchase of Tianeptine (the fourth undercover purchase), I sent an email to info@ycells.com requesting wire transfer information.  In response, on November 13, 2019, I received an email from info@ycells.com with the following wire transfer information:

| | |
|---|---|
| Wire Transfer: | TD Bank |
| Account Name: | Ycells LLC |
| Account Number: | 8253110866 |
| ABA/Routing #: | 211370545 |

80.     Using these wire instructions, on December 12, 2019, I wired $5,000 from an undercover bank account to the TD 0866 TARGET ACCOUNT to execute the purchase of Tianeptine.

**Other Credits to the TD 0866 TARGET ACCOUNT During the Review Period**

81.     During the period from October 2015 through May 2020, the TD 0866 TARGET ACCOUNT received payments totaling approximately $4,572,529.  I have identified the five largest payors into the TD 0866 TARGET ACCOUNT during this period.  Collectively, these five entities made payments of approximately $2,538,920 into the TD 0866 TARGET ACCOUNT during this time period.  Probable cause exists to believe that all funds credited to the TD 0866 TARGET ACCOUNT from these five largest payors are proceeds and subject to seizure and forfeiture.

82.     Through this investigation, I have obtained numerous invoices, quotes, emails, and product order forms reflecting Ycells's sales of products to these five entities.  From these records, it appears that these five entities have exclusively purchased drugs from Ycells that are

---

[3] I have not been able to trace the payment for the third undercover purchase from the records obtained through this investigation to-date.

commonly used for body building or to counteract the effects of steroid use.  These purchases are consistent with the conspiracy set forth above.  Examples of products purchased by these five entities are Clenbuterol, a drug that is used by bodybuilders as a "cutting" agent to reduce fat, Tadalafil and Sildenafil (the active ingredients in the prescription drugs Viagra and Cialis, which are used to treat erectile dysfunction), Raloxifen and Tamoxifen (the active ingredients in drugs used to treat breast cancer—but which are commonly used in the bodybuilding community to treat gynecomastia, a side-effect of some steroids), a number of different Selective Androgen Receptor Modulators ("SARMS"), which are commonly used as performance enhancers for bodybuilding, as well as a number of hormones and steroids.  Based upon my review, I also observed the TD 0866 TARGET ACCOUNT was used for payments to entities in furtherance of the conspiracy.

83.     I submit that probable cause exists to believe that at least $2,538,920 of the funds that entered TD 0866 TARGET ACCOUNT constitute proceeds of the above-described conspiracy.  However, although I have observed numerous other deposits into the TD 0866 TARGET ACCOUNT, based upon the records obtained during this investigation, the balance in the TD 0866 TARGET ACCOUNT in the period after May 28, 2020 was never less than $154,037.  Therefore, probable cause exists to believe that after proceeds entered the TD 0866 TARGET ACCOUNT at least $154,037 in proceeds never left this target account and I seek permission to seize up to that minimum balance, $154,037.

### Seizure of all funds on deposit in the Merrill 79W33 TARGET ACCOUNT

84.     TANG opened the Merrill 79W33 TARGET ACCOUNT on August 26, 2019. TANG also opened an account with account number ending in 2756 (the "TD 2756 Account") on April 6, 2018.  On July 14, 2019, the balance in the TD 2756 Account was $70,869.

Thereafter, as explained immediately below, at least $100,00 in proceeds was credited to the Merrill 79W33 TARGET ACCOUNT and remains there.

85.     On July 25, 2019, $100,000 of illicit proceeds was transferred from the TD 0866 TARGET ACCOUNT (described above) into the TD 2756 Account.  The balance of the TD 2756 Account remained above $100,000 until August 20, 2019.  Then, on August 20, 2019, $100,000 in proceeds from the TD 2756 Account were used to purchase a TD Bank cashier's check.  That cashier's check was deposited into a Bank of America account with account number ending in 9182 (the "BOA 9182 Account") held in the name of TANG until, on September 5, 2019, the $100,000 in proceeds was transferred from the BOA 9182 Account to the Merrill 79W33 TARGET ACCOUNT.  Since September 5, 2019, no disbursements have been made from the Merrill 79W33 TARGET ACCOUNT.  Therefore, probable cause exists to believe that all funds on deposit in the Merrill 79W33 TARGET ACCOUNT constitute proceeds and are subject to seizure and forfeiture to the United States.

86.     The flow of funds from TD 0866 TARGET ACCOUNT to the Merrill 79W33 TARGET ACCOUNT is depicted below:



*Seizure of up to $36,000 from the E\*Trade 3508 Target Account*

87.     TANG opened the E\*Trade 3508 TARGET ACCOUNT on May 25, 2017.  On January 3, 2019, $50,000 in proceeds was transferred from the TD 0866 TARGET ACCOUNT to the TD 2756 Account, bringing the balance in the latter account to $86,399.  Five days later,

on January 8, 2019, $36,000 in proceeds was transferred from the TD 2756 Account to the E*Trade 3508 TARGET ACCOUNT.  Since January 8, 2019, the account balance in the E*Trade 3508 TARGET ACCOUNT was never lower than $36,000.  Therefore, I submit that probable cause exists to believe that at least $36,000 of proceeds has remained in the E*Trade 3508 TARGET ACCOUNT and is subject to seizure and forfeiture to the United States.

***Seizure of up to $80,000 from the JPM 8263 TARGET ACCOUNT***

88.     TANG opened the JPM 8263 TARGET ACCOUNT on August 23, 2019.  On January 13, 2020, $80,000 in proceeds was wired from the TD 0866 TARGET ACCOUNT to an account held in TANG's name at JP Morgan Chase Bank bearing an account number ending in 5468 (the "JPM 5468 Account").  The next day, on January 14, 2020, $80,000 was transferred from the JPM 5468 Account to the JPM 8263 TARGET ACCOUNT.  Since January 14, 2020 the account balance in the JPM 8263 TARGET ACCOUNT was never lower than $80,000. Therefore, I submit that probable cause exists to believe that at least $80,000 of proceeds has remained in the JPM 8263 TARGET ACCOUNT and is subject to seizure and forfeiture to the United States.

***Seizure of all funds on deposit in the TD Ameritrade 5481 TARGET ACCOUNT, less $178***

89.     GONG opened the TD Ameritrade 5481 TARGET ACCOUNT on April 11, 2011.

      a.   On May 16, 2018, the account balance was approximately $178.  Thereafter, $2,000 in proceeds was transferred from the TD 0866 TARGET ACCOUNT to the TD Ameritrade 5481 TARGET ACCOUNT via an account held in the name of Ycells LLC at TD Bank with account number ending in 6839 (the "TD 6839 Account").

b.   On June 26, 2018, $13,000 in proceeds was transferred from the TD 0866 TARGET ACCOUNT to the TD Ameritrade 5481 TARGET ACCOUNT via the TD 6839 Account.

c.   On September 6-7, 2018, $10,000 in proceeds was transferred from the TD 0866 TARGET ACCOUNT to the TD Ameritrade 5481 TARGET ACCOUNT via the TD 6839 Account.

d.   On September 19-20, 2018, $10,000 in proceeds was transferred from the TD 0866 TARGET ACCOUNT to the TD Ameritrade 5481 TARGET ACCOUNT, via the TD 6839 Account.

e.   On September 17-18, 2019, $100,000 in proceeds was transferred from the TD 0866 TARGET ACCOUNT to the TD Ameritrade 5481 TARGET ACCOUNT via the TD 6839 Account.

90.   In sum, between approximately May 16, 2018 and at least October 30, 2020, at least $135,000 in proceeds were deposited into the TD Ameritrade 5481 TARGET ACCOUNT. Since then, there were no other deposits or disbursements from the TD Ameritrade 5481 TARGET ACCOUNT.  Therefore, probable cause exists to believe that all funds on deposit in the TD Ameritrade 5481 TARGET ACCOUNT, except the previously credited $178, are subject to seizure and forfeiture to the United States.

## SEIZURE OF COMPUTER EQUIPMENT AND DATA

91.   From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social networking websites; drafting letters; keeping their calendars; arranging for travel; storing

pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

92. From my training and experience, I am also aware that personal computer systems are generally capable of creating, receiving, and otherwise processing computer files generated at or to be used at a business, such as e-mail, word-processing documents, photographs, and spreadsheets.

93. From my training, experience, and information provided to me by other agents, I am also aware that businesses and individuals commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

94. Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

   a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

   b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.  Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.  Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record

information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and

events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in

advance the records to be sought, computer evidence is not always data that can
be merely reviewed by a review team and passed along to investigators.  Whether
data stored on a computer is evidence may depend on other information stored on
the computer and the application of knowledge about how a computer behaves.
Therefore, contextual information necessary to understand other evidence also
falls within the scope of the warrant.

i.   Further, in finding evidence of how a computer was used, the purpose of its use,
who used it, and when, sometimes it is necessary to establish that a particular
thing is not present on a storage medium.  For example, the presence or absence
of counter-forensic programs or anti-virus programs (and associated data) may be
relevant to establishing the user's intent.

j.   In addition, based on my knowledge, training, and experience, I know that
businesses and businesspeople often retain correspondence, financial,
transactional, and other business records for years to identify past customers and
vendors for potential future transactions; keep track of business deals; monitor
payments, debts, and expenses; resolve business disputes stemming from past
transactions; prepare tax returns and other tax documents; and engage in other
business-related purposes.

95.    Based on my knowledge and training and the experience of other agents with

whom I have spoken,  I am aware that in order to completely and accurately retrieve data

maintained in computer hardware, computer software or storage media, to ensure the accuracy

and completeness of such data, and to prevent the loss of the data either from accidental or

programmed destruction, it is often necessary that computer hardware, computer software, and

storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because of:

a.  The volume of evidence — storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.  Technical requirements — analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or

destruction, both from external sources and destructive code imbedded in the

system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or

seize the computer equipment for subsequent processing elsewhere.

96.     The premises may contain computer equipment whose use in the crime(s) or

storage of the things described in this warrant is impractical to determine at the scene.  Computer

equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In

addition, technical, time, safety, or other constraints can prevent definitive determination of their

ownership at the premises during the execution of this warrant.  If the things described in the

relevant Attachment B are of the type that might be found on any of the computer equipment,

this application seeks permission to search and seize it onsite or off-site in order to determine

their true use or contents, regardless of how the contents or ownership appear or are described by

people at the scene of the search.

97.     The law enforcement agents will endeavor to search and seize only the computer

equipment which, upon reasonable inspection and/or investigation conducted during the

execution of the search, reasonably appear to contain the evidence in Attachment B.  If however,

the law enforcement agents cannot make a determination as to use or ownership regarding any

particular device, the law enforcement agents will seize and search that device pursuant to the

probable cause established herein.

98.     The requested warrant authorizes a review of electronic storage media,

electronically stored information, communications, other records and information seized, copied

or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities

described in this warrant.  The review of this electronic data may be conducted by any

government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, investigators may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CONCLUSION

99.    Based on the information described above, I have probable cause to believe that Yalan TANG and Chenguang GONG have violated 21 U.S.C. §§ 331(d), 21 U.S.C. §§ 331(a) and 331(c), 21 U.S.C. § 331(p); and 18 U.S.C. §§ 371 and 545, and that the TARGET ACCOUNTS contain funds traceable to violations of 18 U.S.C. §§ 371 and 545.

100.    Based on the information above, I also have probable cause to believe that evidence, fruits and instrumentalities of these crimes, as described in Attachment B are contained within the premises described in Attachment A associated with each of the SUBJECT PREMISES.

/s/ William Hughes
_____
William Hughes
Special Agent
FDA-OCI

Subscribed and sworn to telephonically on November 9, 2020,

_____
Chief United States Magistrate Judge